IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 08-cv-01833-RPM

ESMERALDA CASTANEDA, et al.,

      Plaintiffs,

v.

JBS USA, LLC,

      Defendant.

_____

MEMORANDUM OPINION AND ORDER
_____

      JBS-USA, LLC (JBS) owns and operates a beef processing plant in Greeley, Colorado. The employees at that facility work in two production lines, individually performing very specific tasks. Those on the "slaughter" or "kill" line receive live cattle, kill them and disassemble the carcasses. At the end of the line the carcasses are in halves and stored in cooling rooms. The workers on the "fabrication" line cut the carcass halves into primal and sub-primal cuts and box the meat products for sale. All of the production employees are represented by the United Food and Commercial Workers Union, Local No. 2 ("Union") with the terms and conditions of employment governed by a collective bargaining agreement.

      In this collective action under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq., the plaintiffs claim that they have not been compensated for all of the hours worked because the employer has failed to account for activity off of the line that is integral and indispensable to the principal activity of processing wholesome,

uncontaminated beef products in a physically sale manner in compliance with applicable regulations from the Department of Agriculture and the Occupational Safety and Health Administration (OSHA).

This is not the first time that this plant has been before this court and this case must be viewed in historical context.

In December 1992, the United States Department of Labor("DOL") commenced a civil action against Monfort, then operator of the beef plant, as Case No. 92-M-2456. At the time of the commencement of that civil action, there was no collective bargaining agreement in effect at the Greeley beef plant. During the pendency of the litigation, Monfort and the Union entered into a collective bargaining agreement that became effective on September 18, 1994.

That litigation and the Court's findings are summarized in the affirming opinion of the Tenth Circuit Court of Appeals, Reid v. Monfort, Inc., 144 F.3d 1329 (10th Cir. 1998).

Those that are relevant to the present case are as follows:

> The employees at the Greeley plant involved in this case work in the slaughter and processing of beef into primal and subprimal cuts commonly called "boxed beef." They are divided into two groups: slaughter and fabrication departments.
>
> The employees in both departments are paid on "gang time." Accordingly, recorded work begins when the first animal or animal part arrives at the employee's individual work station on the production line and ends when the last animal or animal part leaves that station.
>
> Employees in both departments are required to don safety and sanitary clothing and equipment after they arrive for work and before taking their places on the production line. Separate locker rooms are provided for men and women workers. This activity is not supervised.

> The clothing and equipment required varies according to particular positions and job assignments. A detailed classification of the work involves about 180 job assignments in fabrication and almost 200 job assignments in slaughter. There are multiple combinations of equipment from the following list of items: hard hat, earplugs, hairnets, cotton frocks, knives, scabbards, safety boots, arm guards, arm mesh, mesh apron, back mesh, mesh gloves, a "wizard glove," gaiters, safety glasses, weight belt, rubber gloves and a rubber apron.
>
> There are individual differences in the practices of the employees with respect to time of arrival and time spent in preparing for work. Some workers come early and socialize with co-workers and/or eat in the cafeteria. There are individual differences in the sequence of donning their work clothing and gear.
>
> \*\*\*\*
>
> At lunch, most of the employees take off their scabbards, their knives and their gloves. Some remove parts of their protective gear. After lunch, the employees must again put on whatever equipment they previously took off.
>
> After the shift, the employees must take off and clean certain protective equipment, as well as clean their cutting knives. Employees often wait in line at wash stations. More wash stations have been added during the past year, shortening the time required for waiting. The employees then proceed to their lockers to hang up the protective equipment. Finally, most of the employees deposit their frocks at laundry stations before they are free to go home.

Id. at 1332.

The court found ten minutes of compensable time beyond the gang time, rejecting the claim that it was de minimus. That was affirmed on appeal.

A private collective action was filed in 1998 against Con Agra, successor to Monfort as Catalina Salazar, et al. v. ConAgra f/k/a Monfort, Inc., Case No. 98-M-2653. There was a settlement in that case, which was approved by the Court. During the course of that litigation, the plant and the Union entered into an "Agreement" concerning

3

the appropriate compensation to be paid for designated donning and doffing activities, as discussed later.

That agreement has been incorporated by reference in successive collective bargaining agreements with a modification, as will be discussed.

At a pretrial conference in this case the parties agreed to present evidence limited to liability issues, reserving the question of remedy. At trial, much of the evidence was presented in the form of videos of plant operations taken by the defendant. The Court's observations from these videos are included in the factual findings made in this narrative form.

The core operations are much the same as described in the findings from the earlier trial quoted above.

Production employees, in performing their respective job duties, wore and wear certain items of protective clothing and safety equipment. The specific equipment and clothing worn by any employee depends on the person's job classification and the particular duties he or she performs. All production employees wear "non-unique" clothing and equipment. Non-unique equipment includes a hard hat, hair and beard nets, rubber steel-toed boots, safety glasses, plastic apron, ear plugs, safety glasses, a frock, or uniform pants and shirt, and rubber and/or cotton gloves. Production employees who work on jobs that require the use of a knife, hook or other cutting tool may wear, in addition to non-unique equipment, certain specialized personal protective equipment or "unique" equipment that may include one or more of the following items: belly guard, arm guard, face guard, shin guards, polar gloves, scabbard or knife pouch,

cut resistant gloves, cut resistant sleeves and metal mesh apron and other like safety clothing and equipment. All employees are assigned to work either on the slaughter side of the plant or the fabrication side of the plant.

The slaughter side of the plant operates as a chain-driven production facility disassembling cattle. The end result, two sides of beef, are placed into cold storage for one or two days. Once chilled, the sides of beef are moved out of the coolers to the fabrication side of the plant where the employees further reduce the sides of beef to primal and subprimal cuts which are vacuum packed and boxed for shipping. That too is a chain-driven production line. Employees are paid for the actual time they work on the lines. Therefore, for example, on the slaughter side, employees at the beginning of the chain start and stop their shift prior to employees at the end of the chain.

Each employee is given an assigned start time that correlates with the time the meat is to arrive at his or her work station on the line. The actual starting time is controlled by a measuring device monitored by Defendant's representative and a Union representative on a daily basis. JBS does employ an electronic timekeeping system that is activated by an employee swiping a card. However, that timekeeping system is used only to determine absenteeism and is not reflective of the actual time worked by the employee. The employee's actual time worked is manually recorded by the employee's supervisor on a timesheet at the end of the shift. There are two shifts, the "A" shift beginning at 6:00 a.m. ending at 2:30 p.m. and the "B" shift beginning at 3:00 p.m. and ending at 11:30 p.m.

All employees receive at least one 15-minute paid break during their shift and a 30-minute unpaid meal period. At the beginning of the meal period, employees remove some of their unique and non-unique equipment. Employees are permitted to wear some clothing and equipment into the cafeteria areas. There are separate cafeterias for the slaughter and the fabrication sides of the plant. At the end of the meal period, employees put back on the safety clothing and equipment that they removed at the beginning of the meal period and return to their places on the lines.

As previously noted, the Greeley beef plant and a predecessor Union entered into a collective bargaining agreement in 1994, during the DOL litigation. That CBA, effective from 1994 to 1997 contained the following provision:

> The rates of pay [in the contract] include compensation for time spent changing into and out of work clothes, including safety clothing and/or equipment.

The 1997 to 2000 collective bargaining agreement contained the same language. In 2000, the operator of the Greeley beef plant, ConAgra, and the Union each engaged an industrial engineer to jointly measure the amount of time necessary for employees to don safety clothing and equipment at the commencement of the shift, doffing and donning safety equipment at the unpaid meal period, doffing the safety clothing and equipment, walking to the wash area to clean safety clothing and equipment, waiting at the wash area to clean the safety equipment, and washing the safety equipment, including in appropriate cases, knives and hooks.

Based on the agreed upon times identified by their industrial engineers, the Greeley beef plant and the Union entered into an "Agreement" in 2000. The Agreement

covered the following activities:

    a). Donning of certain safety clothing and equipment and/or gear;

    b). Walking to the wash area to clean such safety clothing and equipment and/or gear;

    c). Waiting at the wash area to clean such safety clothing and equipment and/or gear;

    d). Washing such safety clothing and equipment and/or gear; and

    e). Doffing or such safety clothing and equipment and/or gear;

    f). In addition, for employees who use knives or hooks, the parties agree Monfort will pay for the following additional activities:

        i). Walking to the wash area to clean knives and hooks;

        ii). Waiting at the wash area to clean knives and hooks; and

        iii). Washing knives and hooks.

Exhibit B.

It designated specific amounts of added compensable time for each position on the slaughter and fabrication lines. The 2000 Agreement concerning donning and doffing was carried forward by the parties and incorporated by reference into the 2004-2009 collective bargaining agreement.

The Company was in negotiations with the Union at the Company's Marshalltown, Iowa, pork processing plant for a new collective bargaining agreement in 2007. At that time, the parties agreed to have their respective industrial engineers again perform time studies. However, this time the industrial engineers were instructed

to study not just the donning and doffing of unique equipment, walk to wash, wait at wash, and wash, but also the donning and doffing of nonunique equipment and walk time from the locker rooms to the production floor and back.

Near the expiration of the November 22, 2009 Agreement, Defendant and the Union began negotiations for a new labor contract for the Greeley plant.  In early 2010, Defendant and the Union reached a new agreement whereby Defendant agreed to continue to compensate employees for the donning and doffing and other related activities that the   parties previously had agreed to in September 2000 and had carried forward in the November 2004 Agreement.  In addition, Defendant and the Union negotiated some additional walk-time compensation for the employees, and Defendant also agreed to pay current employees two years of retroactive walk-time.   JBS made retroactive payments to its employees in April 2010 and has been compensating employees in accordance with the agreed-upon terms since the expiration of the prior collective bargaining agreement.

JBS moved for summary judgment in this case and at a hearing on April 26, 2010, this Court granted that motion on the claim for time spent donning and doffing of safety clothing and equipment by applying 29 U.S.C. § 203(o).  That did not resolve the claims for other unpaid work in walk and wait times and during the unpaid meal break.

The plaintiff's central contention is that because they are required to keep tools in their lockers and those tools must be sanitized before use, the continuous workday

begins with the taking of the tools from the lockers and ends when they are restored to the lockers.

At the hearing on the defendant's motion for summary judgment there was a summary ruling that the plaintiffs' claim for compensation for the time spent donning and doffing the clothing and protective equipment worn by the workers on both production lines was within the definition of changing clothes in 29 U.S.C. § 203(o) and the exclusion pursuant to the plant policy established under the CBAs incorporating the Agreement to pay the added times established by the measurements of the industrial engineers referred to as "plug times."

That did not resolve the plaintiffs' claim that obtaining the tools required to be kept in the employees' storage lockers begins the continuous workday because that activity is integral and indispensable to their principal activity of the safe processing of uncontaminated beef products. Similarly, they say that the workday does not end until that equipment is stored back in the lockers. The plaintiffs also contend that the 30-minute meal break is not bona fide under 29 C.R.S. § 785.19(a) because the donning and doffing required before leaving and after returning to the production lines significantly reduces the time available to eat a regular meal.

As noted earlier, the evidence presented at the trial was largely in the form of excerpts from videotapes taken by the employer showing the actual operations of the plant. They demonstrate that there are substantial amounts of time required in walking from the locker rooms to the assigned positions on the lines and waiting because of congestion in their areas before the beginning and ending of the work performed on the

lines. As noted earlier, some walk time was added to the plug times in 2010 as a result of the measurements made by the industrial engineers, and employees then working at the plant were given some additional payment based on those measured times. That adjustment is not determinative of liability but would be the basis for some credit toward determining the amounts owed if liability is found. It is also the basis for the defendant's concession that the workday ends with the required washing of the tools and PPE after leaving the lines.

Capturing the actual times involved in the waiting and walking from the locker rooms to the assigned line positions by each employee is impractical and not feasible given the working conditions and the large numbers of workers on each shift with variations in their assigned specialized duties and their positions on the lines. The defendant's efforts to add walk time to the plug minutes are based on measurements of distances from locker rooms to a mid-point on the production lines and a set pace for walking. They assume no obstructions for crowding of the routes..

The plaintiffs' theory of liability, described by the defendant derisively as "touch to touch" is argued as a logical extension of the Supreme Court's view in IBP v. Alvarez, 546 U.S. 32 (2005) and has the support of some lower court decisions in related contexts. The defendant denies the applicability of Alvarez, noting that § 203(o) was not considered in that opinion.

Alvarez is not controlling. There is no direct continuity between retrieval of the equipment from the lockers and the beginning of work on the lines. The employees are not required to move directly from their lockers to the line. Similarly, there is no

requirement that the workers go directly to their lockers after leaving the wash area at the end of the shift.  Additionally, the videos show substantial individual differences in the manner and times that are involved in the off line activities that would be compensable under the plaintiffs' theory of the continuous workday.

Recognizing that gang time alone is not an appropriate basis for determining compliance with the FLSA, the question is whether the plug time additions are reasonable measurements of the work that must be compensated.  The 2010 settlement is not directly relevant to that question.  This case was filed on August 27, 2008, and, therefore, liability depends upon the practices followed during the preceding 3 years, if there is a wilful violation or 2 years, if not.  The relevant plug times are those used before the 2010 adjustment based on the measurements made in 2007.

It is difficult to adapt the statutory language of the FLSA to the realities of the meat processing industry as shown by the multiplicity of litigation in the courts and the changing views of the Wage and hour Division of the Department of Labor, (DOL).  In 2002, the DOL issued a letter expressing the view that protective safety equipment typically worn by meat packing employees is within the definition of section 3(o) and subject to being treated as non-compensable in a collective bargaining agreement.  That reversed a 1997 opinion letter.  After the Ninth Circuit Court of Appeals issued a contrary view in <u>Alvarez</u> v. <u>JBP, Inc.</u>, 339 F.3d 894 (9th Cir. 2003), the DOL issued another opinion letter in May, 2007, reaffirming the view in the 2002 letter for states outside the Ninth Circuit.  The DOL noted that the Supreme Court did not address the section 3(o) issue in its opinion.

The central questions in this case are when does the workday begin and end and does the meal period provide an adequate opportunity for the workers to eat a meal. It is clear that the workday is not accurately measured by the time on the production lines. It is also clear that walk times should be added to the plug times for donning and doffing in the CBA's that were the basis for this court's ruling on the applicability of § 203(o) on summary judgment. The plaintiffs' claims for compensation for walk times during the shift are not subject to section 3(o) and the measurement for each individual is not feasible. Accordingly, a reasonable amount must be determined. At a minimum the 2010 voluntary adjustments should be recovered by all of the employees working during the relevant period. That period is three years from the filing date if the failure to pay was willful under 29 U.S.C. § 255(a).

The test for a willful violation is whether the employer knew or showed reckless disregard for whether its conduct violated the FLSA. McGlaughlin v. Richland Shoe Co., 486 U.S. 1228, 133 (1988). The evidence does not support the plaintiffs' claim of a willful violation. While the DOL letters did not address issues beyond § 203(o), the defendant did work with the Union in setting the plug times and that negates a finding that the employer disregarded its obligations under the statute.

JBS has asserted a good faith defense to any liability under § 259 based on its claimed reliance on the DOL letters of 2002 and 2007. Those letters were limited in scope and are insufficient to provide a complete defense to the plaintiffs' claims.

JBS also contends that it should not be liable for liquidated damages because it has acted in good faith with reasonable grounds for believing that it was not in violation of the

FLSA. 29 U.S.C. § 260 gives the court discretion to deny or reduce the liquidated damages penalty of § 216(b). The defendant has made a satisfactory showing of good faith and no liquidated damages will be awarded.

The employer did not provide a full 30 minute meal break to its employees. The plug times for donning and doffing includes that required for the meal break. It does not recognize the fact that the time required to remove clothing and equipment and walk to the cafeteria and the time to return, fully equipped to the assigned positions on the production line substantially erodes the time available to eat lunch. An adequate meal break is an obligation that is necessary for the health and safety of the employees, an essential purpose of the FLSA. § 202. The employer has not provided a full 30 minute meal break and the minimal amounts of plug times for donning and doffing during the break do not satisfy the obligation imposed by the statute and the regulation.

While the plaintiffs' contention that the continuous workday should be measured by the removal from and return to the lockers of the tools and equipment is rejected, the evidence shows that the plaintiffs have not been fully compensated for their work. The questions relevant to remedy may require a determination of the reasonableness of the plug times based on the 2007 measurements. The videos displayed during the trial showed times but there are disputes about those elapses of time and this court has not attempted to analyze them for that purpose. The reasonableness of the methodology employed in the 2007 study and the computations in the 2010 adjustment have not been fully examined. An appropriate remedy for the failure to provide a bone fide 30 minute

meal break must be determined. Accordingly, additional trial time is required for a final adjudication of this case.

It is ORDERED that the foregoing narrative shall constitute the findings and conclusions under Fed.R.Civ.P. 52 on the questions submitted pursuant to the Final Pretrial Order entered on February 25, 2011, and an additional pretrial conference will be held to determine the procedure for final resolution of this case.

DATED:   August 1st, 2011

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge